UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GERALD GREEN,

                              Plaintiff,                    **OPINION & ORDER**

            – against –                                    20 Civ. 4655 (ER)

CAPITAL ONE, N.A., and SQUARE, INC.,

                              Defendants.

Ramos, D.J.:

        Gerald Green has brought suit against Capital One and Square, Inc., alleging violations of

the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq*., and New York General

Business Law § 349 ("GBL § 349").  Before the Court is Capital One's motion to dismiss

Green's Amended Complaint.  For the reasons discussed below, Capital One's motion is

GRANTED in part and DENIED in part.

    I.      **BACKGROUND**

        A.      **Factual Background**

        Green holds a bank account with Capital One.  On June 19, 2019, Green attempted to

initiate a transfer of funds to his friend, Edward Butler.  ¶ 16.[1]  To effectuate this transfer, Green

used a mobile application called "Cash App," which is a product of Square.  ¶ 17.[2]  Green

alleges that Butler was unable to access the funds from this transfer, despite the fact that he

---

[1] All citations to "¶ _" refer to the Amended Complaint, Doc. 27.

[2] Square was previously named as a defendant in this case but has reached a settlement agreement with Green.  *See* Doc. 40.

received a notification that the transfer had been successful. ¶ 21.  Green alleges that this transaction was never completed. ¶ 20.

Looking to troubleshoot the situation, Butler went online and found a telephone number that was purportedly a Cash App customer support line. ¶ 23.  Green and Butler then called the number together and spoke to an individual claiming to be a Cash App representative. ¶ 24. Green alleges, however, that this was not a Cash App representative, but an individual—referred to in the Amended Complaint as the "Fraudster"—who was engaged in a scheme to steal the personal information of Cash App users who unwittingly called the number. ¶ 25.

Green and Butler grew suspicious after this individual asked several intrusive personal questions about their bank account information, though they provided him with some of the information he sought.  ¶¶ 27–28.  However, during the call, Butler received several alerts regarding additional transactions that neither he nor Green had authorized. ¶ 30.  Green and Butler eventually hung up, and Green deleted Cash App from his phone soon thereafter.  ¶¶ 32–33.  However, Green soon discovered that more than one thousand dollars had already been transferred from his bank account to the accounts of unknown third parties without his consent. ¶¶ 34–36.

Green informed Capital One of these unsanctioned transactions after discovering them. ¶ 38.  Capital One initially refunded the money, pending an investigation into whether the transfers had been made in error.  ¶ 39, *see also* Doc. 35-3.  Green also attempted to report the situation to Square by telephone; however, he was notified that Square did not provide live telephone assistance and that there are many people illegally impersonating Cash App representatives. ¶ 43.  He then reported the transfers to Square by email, but alleges that Square took no action in response.  ¶¶ 44–46.

Several months after Green reported the incident, Capital One reversed three of the four refunds in his account, stating that the allegedly fraudulent activity had solely been the responsibility of Green and Square.  ¶ 40.  Green alleges that this situation was "not unusual" for Capital One, citing the existence of thousands of complaints to the Better Business Bureau ("BBB") regarding "Billing/Collection Issue[s]."  ¶ 41.  He also cites to statistics regarding complaints to the Consumer Financial Protection Bureau ("CFPB") related to "problem making or receiving payments[,]" "banking errors[,]" "funds not handled or disbursed as instructed[,]" and consumer complaints that a "transaction was not authorized[.]"  ¶ 42.

### B.    Procedural History

Green filed suit against Capital One and Square on June 17, 2020, alleging that both entities had violated the EFTA and GBL § 349.  Doc. 1.  Capital One first moved to dismiss on September 23, 2020, and Green filed an amended complaint on October 14, 2020.  Doc. 27.  Capital One moved to dismiss the Amended Complaint on November 18, 2020.  Doc. 33.  On December 15, 2020, this action was dismissed as to Square pursuant to a settlement agreement.  Doc. 40.

### II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 557).

However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### III.   DISCUSSION

#### A.   EFTA Violations

Green's allegations under the EFTA implicate two parts of the statute.  First, he alleges that Capital One's reversal of the refunds in his account violated 15 U.S.C. § 1693g(a), which presumptively caps consumer liability for "unauthorized" transfers at $50.  He also alleges that Capital One violated § 1693f, which requires the financial institution to follow certain procedures to investigate allegedly erroneous transfers following the receipt of a consumer complaint.  Green's allegations are limited to three transactions made on June 19, 2019, all of which he alleges occurred *after* he and Butler called the individual impersonating a Cash App representative.  *See* Doc. 41 at 6, *see also* Doc. 35-2 (Green's bank account statement).  While these transfers are listed on Green's account statement as having been made to Butler, Green alleges that the funds were never transferred to Butler and ultimately went to other parties.  ¶¶ 35–36.  He does not, however, seek to recover for the initial attempted transaction to Butler, which he states was never effectuated, and also concedes that he initiated.  *See* Doc. 41 at 6.

##### i.   Green States a Claim for a Violation of 15 U.S.C. § 1693g(a)

Capital One has argued that Green cannot state a claim under § 1693g(a) because the transfers in question were not "unauthorized" under the EFTA, and because he did not contact Capital One until June 20, 2019, the day after the disputed transfers posed to his account.  Both arguments fail.

The EFTA defines an "unauthorized electronic transfer" as:

> an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit.

§ 1693a(12).

However, the statute provides that the above definition does <u>not</u> extend to any electronic fund transfer:

> (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized,
>
> (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or
>
> (C) which constitutes an error committed by a financial institution.

*Id.* at § 1693a(12)(A)–(C).

Both the Board of Governors of the Federal Reserve System and the CFPB have promulgated regulations implementing the EFTA.  These agencies have proffered identical definitions of "unauthorized electronic fund transfer," which are substantially the same as the definition appearing in the statute.  *See* 12 C.F.R. § 205.2(m) (Board of Governors regulation); 12 C.F.R. § 1005.2(m) (CFPB regulation).[3]  The agencies have also proffered Official Interpretations of §§ 205.2(m) and 1005.2(m), respectively, elaborating on this definition.  Both Official Interpretations include the so-called "fraud exception," which states that "[a]n unauthorized [electronic funds transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery."  *See* 12 C.F.R. § 205, Supp. I at 2(m) (Board of Governors' Official Interpretation of § 205.2(m)); 12 C.F.R. § 1005, Supp. I at

---

[3] For example, 12 C.F.R. § 205.2(m) provides that "'Unauthorized electronic fund transfer' means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. The term does not include an electronic fund transfer initiated:

> (1)  By a person who was furnished the access device to the consumer's account by the consumer, unless the consumer has notified the financial institution that transfers by that person are no longer authorized;
>
> (2)  With fraudulent intent by the consumer or any person acting in concert with the consumer; or
>
> (3)  By the financial institution or its employee."

2(m) (CFPB's Official Interpretation of § 1005.2(m)).  An "access device" refers to "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers."  12 C.F.R. § 205.2(a)(1).[4]

In its opening brief, Capital One argued that the transfers were authorized because Green voluntarily provided his personal and account information to the individual purportedly associated with Cash App.  Doc. 34 at 10.  On this basis, it argued that Green furnished the "means of access" to his account to this individual.  *Id.*; *see also* § 1693a(12)(A)).  Green argued in response that the transfers fell squarely within the fraud exception set forth in the Official Interpretation, which Capital One did not address in its opening brief, and would otherwise be considered "unauthorized" under a commonsense understanding of the word.

Green has adequately stated a claim for a violation of § 1693g(a).  As a threshold matter, it is self-evident that an individual falsely posing as a customer service representative—with no connection to Capital One or Square—would not have the "actual authority" to initiate a transfer, as required by § 1693a(12).  Nor would this individual be considered "a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account" who has not had that authorization revoked, because the Official Interpretation clearly distinguishes between access legitimately granted and later revoked on the one hand, and access obtained by fraud or theft on the other hand.  *Compare* 12 C.F.R. § 205, Supp. I at 2(m)(2) ("If a consumer . . . grants authority to make transfers to a person [such as a family member or co-worker] who exceeds the authority given, the consumer is fully liable for the transfers unless the consumer has notified the financial institution that transfers by that person are no longer

---

[4] Because all provisions of 12 C.F.R. § 205.2(m) and its Official Interpretation cited to in this Opinion are identical to the corresponding provisions of § 1005.2(m) and its Official Interpretation, to Court will cite only to the Board of Governors materials for brevity.

authorized.") *with id.* at 2(m)(3) ("An unauthorized [electronic funds transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery.").  Thus, under the Official Interpretation, access obtained by fraud was never truly "authorized":  If it were, there would be no need to differentiate between the above situations.  This distinction is also commonsense, as it would be illogical to require a consumer to revoke the account access of an individual who was never intended to have such access in the first place, or else risk liability for any resulting unintended transfers under § 1693g(a).  Thus, the Court finds, consistent with the fraud exception, that access to account information that was furnished in the first instance under fraudulent pretenses is not "authorized" access under the EFTA.

Capital One did not address the fraud exception in its opening brief, nor has it contested Green's argument that the Official Interpretation is reasonable and would thus be entitled to deference.[5]  Rather, Capital One has cited several cases in which a transaction was found to be "authorized" because the consumer voluntarily furnished the necessary information for a third-party to gain account access.  *See L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 113–115 (2d Cir. 2020) (consumer authorized access to his bank account by entering his debit card information into a webpage integrated into a video game store's checkout process); *Aikens v. Portfolio Recovery Assocs., LLC*, 716 F.App'x 37, 39–40 (2d Cir. 2017) (consumer authorized access by providing her account number to an employee of the defendant over the phone); *Gilbert v. Bank of Am., N.A.*, 13 Civ. 1171 (JSW), 2014 WL 12644029, at *3 (N.D. Cal. Sept. 23, 2014) (consumers provided account access to payday lenders who were alleged to be unlicensed).

---

[5] The Court independently can identify no reason why it should not follow the applicable regulations and Official Interpretations.  *See Gale v. Hyde Park Bank*, No. 02 Civ. 3663, 2007 WL 2358625, at *3 (N.D. Ill. Aug. 8, 2007) (noting, in the EFTA context, that the Board of Governors' interpretation of its own regulations is accorded great deference) (citing *Udall v. Tallman*, 380 U.S. 1, 16 (1965)).

However, none of these cases involve situations in which the account access was obtained through fraudulent pretenses, and thus they do not implicate the fraud exception.

For example, in *Webloyalty.com*, a consumer sued a company that ran a "fee-based monthly discount club" for which the consumer had registered while making a purchase at a video game store.  673 F.App'x 100, 103 (2d Cir. 2016).[6]  In its opinion affirming dismissal of the claim, the Second Circuit noted that the text of the "enrollment page" at issue—i.e., the screen through which the consumer registered for the discount program—met all the disclosure requirements for pre-authorized electronic fund transfers under 15 U.S.C. § 1693e(a) and the applicable regulatory guidance thereto, as the company fully disclosed "the amount to be deducted from appellant's account and the frequency with which the scheduled debits would take place." *Id.* at 106.  On this basis, the court found no impropriety and held that the transfer had been authorized.  Similarly, in *Aikens*, the plaintiff alleged that she had orally entered into a payment plan regarding her credit card debt, and that the defendant had made debits pursuant to that agreement but without prior written approval in violation of § 1693e.  716 F.App'x at 39.  The court noted that these transfers were not "unauthorized" under the EFTA because she had orally approved the payment plan with defendant, and the defendant "did not take more money than was agreed to ... [or] withdraw the money from any other account than that which [Aikens] authorized." *Id.*  There was no allegation that the plaintiff provided such approval under fraudulent pretenses.  At base, the dispositive distinction between *Webloyalty* and *Aikens* on the one hand, and the instant case, is that in those two cases the cardholders voluntarily provided their card access information to the third-party providers.  Here, the allegation is that the

---

[6] *Webloyalty.com* has reached the Second Circuit twice.  The Court cites to its 2016 opinion herein because this opinion more directly addressed the § 1693g issue.

supposed Cash App representative was not a legitimate third-party provider and that Green's card access information was obtained through fraud.

Capital One also cites to *Merisier v. Bank of Am., N.A.*, 688 F.3d 1203, 1210 (11th Cir. 2012) which affirmed a bench trial verdict finding that certain transfers had been authorized, despite referring in passing to the possibility that the plaintiff had been "duped" because she provided her bank account information to her ex-boyfriend. However, *Merisier* too was decided on different grounds. In *Merisier*, the Court found that the transactions had been authorized as part of a larger fraudulent scheme perpetrated by the plaintiff's ex-boyfriend, and that the plaintiff had either been in on the scheme, or that she had provided her ex-boyfriend with account access without subsequently notifying Bank of America that this authorization should be withdrawn. *Id.* Thus, while the court in *Merisier* acknowledged that the plaintiff *may* have failed to revoke a valid authorization, there was no factual finding that access to the plaintiff's account itself was obtained by fraud or theft and would thus be covered by the fraud exception.[7] *Cf. Rusthoven v. TCF Nat. Bank*, No. 07 Civ. 3154 (JRT)(JJK), 2009 WL 2171105, at *3 (D. Minn. July 20, 2009) (denying summary judgment for bank on § 1693g claim and citing the fraud exception when the evidence could show that a third party obtained access to the plaintiff's debit card by stealing it from his truck).

In its reply brief, Capital One appears to abandon its original theory, arguing instead that the relevant "person" to authorize these transactions was Square, as opposed to the individual posting as a Cash App representative. *See* Doc. 44 at 4–5, n.6 (arguing that the transfers were authorized because Green "authorized Square to initiate transfers," that "Square did initiate the transfers at-issue," and that Green never rescinded Square's access to his account). It also argues

---

[7] Indeed, the fraud exception is not referenced in the *Merisier* opinion, which relies heavily on evidence that the plaintiff herself was engaged in the scheme to defraud the bank. *See* 688 F.3d at 1207–08.

that to the extent any fraud was committed, it would have been Square's responsibility to

reimburse Green, and that permitting recovery from Capital One would open the door to

duplicative recovery from two financial institutions and/or absolve Square from its own

responsibilities under the EFTA.  *Id.* at 5 n.6.  Because these arguments were introduced for the

first time in Capital One's reply brief and Green has not had an opportunity to respond, the Court

will not consider them.  *See In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485

(S.D.N.Y. 2017) (arguments or requests for relief raised for the first time in a reply brief need

not be considered).  The Court also notes that Capital One's new theory relies on several

extrinsic documents, such as Capital One's instructions for linking a bank account to third parties

such as Cash App, as well as Green's Electronic Fund Transfer agreement with Capital One.

However, such documents were neither explicitly referenced nor "relie[d] heavily upon" in

"terms and effect" in the Amended Complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d

147, 153 (2d Cir. 2002) (citation and quotation marks omitted).  Thus, the Court cannot consider

this evidence, or Capital One's new arguments based on it, at this time.

  Finally, Capital One argued in its opening brief that Green did not contact Capital One

"while the transfers were pending" to stop the bank from processing them, but rather waited until

the following business day to do so.  Doc. 34 at 11.  This is true, but it does not impact Green's

claim.  Rather, § 1693g(a), which presumptively caps consumer liability for unauthorized

transfers at $50, provides only that "reimbursement need not be made to the consumer for losses

which . . . would not have occurred but for the failure of the consumer to report any loss or theft

of a card or other means of access within two business days . . . ."  Here, it is undisputed that

Green reported the theft of his account information within two business days.  Thus, the fact that

Green called Capital One the day after the disputed transactions had posted is of no legal significance.

Green has adequately alleged that the disputed transfers were "unauthorized," and that his liability for them should not have exceeded $50. Accordingly, he has stated a claim for a violation of § 1693g.

### ii.     Green States a Claim for a Violation of 15 U.S.C. § 1693f

Green has also alleged that Capital One failed to conduct a reasonable investigation pursuant to 15 U.S.C. § 1693f. Section 1693f requires that a financial institution investigate any "error" reported by a consumer within ten business days of its receipt of notice of such error. *See* 15 U.S.C. § 1693f(a). Alternatively, the institution may, within ten business days, provisionally recredit the consumer's account for the alleged error pending the conclusion of such investigation, provided that the investigation is concluded within forty-five days of the receipt of notice of the error. *Id.* at § 1693f(c). In either event, the bank must notify the consumer of the results of its investigation. An "error" includes an unauthorized electronic transfer. § 1693f(f).

The financial institution bears the burden of establishing that a transaction *was* authorized. § 1693g(b). If Green establishes that Capital One's investigation did not comply with § 1693f, he may be entitled to compensatory and statutory damages under § 1693m, and treble damages under § 1693f(e) if certain other requirements are met.

There is limited guidance as to what constitutes a reasonable investigation under § 1693f. The parties' arguments focus on whether Capital One, in its efforts to comply with the error resolution process set forth in § 1693f(c), above, adhered to the regulatory requirements contained in 12 C.F.R. § 205.11(c)(4) and the Official Interpretation thereof.

Section § 205.11(c)(4) provides that a financial institution's "review of its own records regarding an alleged error" satisfies the investigation requirement of §1693f if:

"(i) The alleged error concerns a transfer to or from a third party; and

(ii) There is no agreement between the institution and the third party for the type of electronic fund transfer involved."[8]

12 C.F.R. § 205.11(c)(4).

The Official Interpretation of § 205.11 offers further guidance as to a financial institution's investigatory obligations.  It provides that:

When there is no agreement between the institution and the third party for the type of [Electronic Funds Transfer] involved, the financial institution **must review any relevant information within the institution's own records for the particular account to resolve the consumer's claim.  The extent of the investigation required may vary depending on the facts and circumstances.  However, a financial institution may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim.**

Supp. I to § 205 at 11(c)(4)–5 (Official Interpretation of § 11(c)(4) (emphasis added)).[9]

Thus, when read in conjunction with the implementing regulations and Official Interpretation, § 1693f requires that any investigation under the statute include a reasonable review of the financial institution's own records.  The Official Interpretation also provides further illustrative examples of information that may be reviewed as part of such an investigation, including "the transaction history of the particular account for a reasonable period of time immediately preceding the allegation of error" and "information relative to the account in

---

[8] It is nowhere alleged in the Complaint that Capital One and Square have an agreement regarding the sort of transfers at issue here; thus, the parties agree that § 205.11(c)(4) governs Capital One's investigatory responsibilities.

[9] Here, too, the Board of Governors and CFPB have promulgated identical regulations as to this issue.  *Compare* 12 C.F.R. § 205.11(c)(4) *with* 12 C.F.R. § 1005.11(c)(4) and Supp I to § 205 (Official Interpretation of 11(c)(4)) *with* Supp. I to § 1005 (Official Interpretation of § 11(c)(4)).  Again, the Court will cite only to § 205.11(c)(4) and its Official Interpretation for simplicity.

question within the control of the institution's third-party service providers if the financial institution reasonably believes that it may have records or other information that could be dispositive."  Supp. I to § 205, at 11(c)(4)–5.

With this background, Green alleges that Capital One's investigation was inadequate because a reasonable investigation would have included a review of the following facts, which in turn would have led Capital One to conclude that fraud had occurred:

> a. [Green] did not authorize the disputed transactions;
>
> b. [Green] promptly reported the fraudulent transactions;
>
> c. [Green] has no history of making false or unverifiable fraud reports;
>
> d. [Green] has no criminal history;
>
> e. [Green] has no history of irresponsible use of his account;
>
> f. [Green] has no history of frauds with Capital One, N.A., Square, Inc. or any other financial institution;
>
> g. No other proof exists to refute [Green's] claim.

¶¶ 53–54.  He also relies on the fact that it was Capital One's burden to show that the disputed transactions were authorized.  ¶ 55.

Capital One has argued that these allegations are too conclusory, and that its only obligation under § 205.11 was to review its *own* records.  Doc. 34 at 12.  It also argues that it sufficiently met these investigatory responsibilities by contacting Square and relying on Square's information to conclude that there was no error.  *Id.*

Capital One correctly cites the text of § 205.11.  However, it has made no affirmative argument regarding any review it actually conducted *of its own records*.  Rather, Capital One's moving brief is silent as to what its investigation entailed, other than the fact that—through this investigation—it relied on information from Square to conclude that the transactions had been

authorized.[10]  Doc. 34; *see also* Docs. 35-4, 35-5 (letters to Green stating that, for each of the

claims at issue, "[t]he merchant info shows there was no error.").[11]  Thus, in the absence of a

more specific argument about Capital One's investigation of its own records, the Court must

determine whether Capital One's reliance on Square's representations would be sufficient to

constitute an investigation under §1693f as a matter of law, and, if not, whether Green has

otherwise sufficiently alleged that Capital One failed to conduct an investigation in compliance

with § 1693f and its implementing regulations.

Capital One cites *Cifaldo v. BNY Mellon Inv. Serv. Trust Co.*, 17 Civ. 842 (JAD)(NJK),

2017 WL 6513342, at *2 (D. Nev. Dec. 19, 2017) to argue that its outreach to Square fulfilled its

statutory obligations.  In *Cifaldo*, the District of Nevada found the defendant had "sufficiently

investigated" the alleged error under § 1693f when the defendant's letter stated that its denial

"was based on the information provided to [it] verbally by the merchant," and subsequently

provided the plaintiff with documentation corroborating the merchant's verbal representations.

*Id.*  However, in *Cifaldo*, the plaintiff does not appear to have alleged that there was any specific

information within the bank's own records that, if examined, would have impacted the outcome

of its investigation, nor did the court analyze the Official Interpretation of § 205.11.  This is

important because § 205.11 and the Official Interpretation make clear that a financial

institution's core obligation is to conduct a reasonable investigation of its *own* records, and that

outreach to a third-party merchant is simply one permissible investigative technique to

supplement such an investigation.  *See* Supp. I to § 205 at 11(c)(4)–5 ("[T]he financial institution

---

[10] Capital One's reply brief states that its investigation "included, *but was not limited to*, being informed by Square . . . that the disputed transfers were authorized[,]" but does not elaborate further.  Doc. 44 at 5 (emphasis in original).

[11] Capital One's introduction of the underlying correspondence with Green is proper to consider in this Opinion, because this correspondence was incorporated by reference and is otherwise integral to the Amended Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

must review any relevant information within the institution's own records" and solely relying on payment instructions[12] is insufficient when there is "additional information within [the financial institution's] own records" that could be probative as to whether an error occurred).

Thus, with due consideration of the Official Interpretation, *Cifaldo* is best understood as holding that a third-party merchant's evidence and representation that a transaction was authorized *may* suffice to meet § 1693f's investigatory requirements—such as when the plaintiff fails to allege that there is other relevant evidence within the bank's own records that the bank failed to consider—but it does not constitute a *per se* rule.  The upshot is that Capital One's outreach to Square did not automatically render the investigation adequate; however, it was a proper investigatory action that the Court may consider in its analysis.  *See* Supp. I to § 205 at 11(c)(4)–5 (permitting financial institutions to request information "within the control of the institution's third-party service providers if the financial institution reasonably believes that [the third-party] may have records or other information that could be dispositive.").[13]  However, the Court must also consider whether Green has adequately alleged that there was other relevant information, within Capital One's own records, that it overlooked in favor of its reliance on Square.

In this respect Green has—just barely—alleged the minimum to state a claim.  Green alleges that Capital One failed to consider several facts relevant to his account that would have

---

[12] The term "payment instructions" often refers to an ATM card and its PIN.  For the purposes of this motion, the Court assumes that "payment instructions" would refer to instructions from Cash App to Capital One to withdraw the funds via the Cash App platform.

[13] Capital One has not argued that the Official Interpretation is unreasonable, inconsistent with the statute, or that it otherwise should not be followed, and the Court again identifies no basis on which this would be the case.  While Capital One correctly points out that the Official Interpretation's list of possible investigatory actions is not mandatory, this does not impact the portions of the Official Interpretation that *are* mandatory:  its instructions that "the financial institution must review any relevant information within the institution's own records" and that it cannot rely solely on payment instructions where "additional information within [its] own records pertaining to the particular account in question could help to resolve a consumer's claim."  Supp. I to § 205 at 11(c)(4)–5.

supported his contention that the transactions were unauthorized, such as that he had no history

of false or unverifiable reports, no history of irresponsible use of his account, and that Capital

One was or should have been aware that schemes of the sort described in the complaint are

common.  In short, viewed in the light most favorable to Green, he has alleged that (1) a review

of his transaction history and background would have suggested that the disputed transfers were

inconsistent with his previous behavior and thus likely unauthorized; and (2) because it is Capital

One's burden to show that the transactions *were* authorized, Capital One must have failed to

consider this evidence.  *See* §1693g(b) (it is the financial institution's burden to show a

transaction was authorized).  While Green's allegations could be more detailed, the Court agrees

that a review of this information—particularly any information in the possession of Capital One

such as his history of recent transactions—would at least have been relevant to Capital One's

determination, which is all that is required under the Official Interpretation.  And because Capital

One's correspondence with Green shows no indication that its own records were reviewed (and it

makes no other representations this regard), Green has plausibly alleged that it indeed failed to

review this information.  *Cf. Wilson v. Harris N.A.*, No. 06 Civ. 5840, 2007 WL 2608521, at *6

(N.D. Ill. Sept. 4, 2007) (denying motion to dismiss in the similar treble damages context under §

1693f(e)(2), where the plaintiff alleged that records available to the defendant bank, including

the plaintiff's transaction history, would have demonstrated that an error occurred despite the

fact that the fraudulent transfers had been made using her ATM card and PIN).

However, the Court acknowledges the possibility—which is also plausible—that Capital

One *did* review these items as part of its investigation and simply made the decision to credit

Square's representation notwithstanding this evidence.  If this is what happened, Capital One

may well have a defense to this claim.  However, the full slate of information that was available

to Capital One is not properly before the Court, nor is any specific documentation of the information from Square on which Capital One relied.  Because this is a motion to dismiss, the Court will decline to speculate as to what the weight of these respective pieces of evidence will ultimately be.[14]

### B.        Green Fails to State a Claim Under GBL § 349

Green has also alleged that Capital One violated New York General Business Law § 349 by "falsely alleging that it had performed a *bona fide* investigation into the fraudulent transactions" and "falsely alleging that the unauthorized transactions were the sole responsibility of Square, Inc." ¶ 62.  It alleges that these misrepresentations occurred as "part of a recurring policy and practice of seeking to avoid responsibility in refunding consumers for fraudulent transfers." ¶ 65.

To state a claim under GBL § 349, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice.  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)).  Capital One has moved to dismiss Green's § 349 claim, arguing that Green has failed to allege any "consumer-oriented" conduct or conduct that was plausibly deceptive or misleading.  Capital One also argues that Green fails to set forth how Capital One's conduct proximately caused his injury.  The Court agrees with Capital One that Green fails to state a claim.

---

[14] In its reply brief, Capital One also states that Square, and not Capital One, was the entity that would have had the ability and information to "conclusively determine whether the transfers were authorized by Plaintiff," or to "determine if [Cash App] was manipulated by a fraudster." Doc. 44 at 7.  However, because these statements are predicated on new facts introduced in the reply brief, as discussed in the previous subsection, the Court cannot rely on them.

Under § 349, conduct is "consumer-oriented" when it involves acts or practices with a "broader impact on consumers at large." *Koch v. Greenberg*, 626 F.App'x 335, 340 (2d Cir. 2015) (*citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) (citations omitted)). Thus, private disputes, such as contract disputes or single-time transactions, would not violate § 349. *Oswego*, 85 N.Y.2d at 25. Conduct need not be recurring to violate § 349. *Id.* However, when a plaintiff "makes only conclusory allegations of impact on consumers at large, a GBL § 349 claim must be dismissed." *Miller v. HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500, 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015).

Here, the allegedly deceptive conduct was Capital One's representation that it had engaged in a *bona fide* investigation of the disputed transactions, and that any unauthorized transactions were the responsibility of Square. However, Green has not adequately alleged that this conduct has a "broader impact on consumers at large." *Oswego*, 85 N.Y.2d at 25. Rather, the disputed transactions were direct transfers between private parties, and the question of whether Capital One falsely stated that it engaged in a *bona fide* investigation hinges on the details of those transactions and Capital One's investigatory techniques, as discussed in the previous section. Indeed, the two bases for Green's allegation that Capital One's representations were misleading—that no *bona fide* investigation was actually conducted and that its reliance on Square's information was inappropriate—are predicated on Green's position that Capital One did not sufficiently consider information *specific to him* and his particular account history. *See* ¶ 54; *see also Silverman v. Household Fin. Realty Corp. of N.Y.*, 979 F. Supp. 2d 313, 318 (E.D.N.Y. 2013) (dismissing § 349 claim when the allegedly deceptive acts concerned facts specific to the plaintiffs and did not impact consumers at large).

Green attempts to dodge this issue by alleging that Capital One "deals with a large volume of consumers who dispute unauthorized charges," and that it allegedly has "a recurring policy and practice of seeking to avoid responsibility in refunding consumers for fraudulent transfers." ¶¶ 64–65.  However, these allegations are conclusory because Green fails to specify the substance of what Capital One's alleged policy is.  To the extent he intends to allege that Capital One has a systemic policy of falsely representing to consumers that it conducted a reasonable investigation and improperly relying on third-party representations, this allegation lacks sufficient factual support.  Rather, the Complaint only states that the BBB has received a large number of complaints about Capital One regarding "Billing/Collection Issue[s]," as well as the CFPB's receipt of complaints regarding categories such as "problem making or receiving payments," "banking errors[,]" "funds not handled or disbursed as instructed[,] and "transaction was not authorized[.]" ¶¶ 41–42.  These allegations may suggest that some percentage of consumers have billing or transaction related grievances with Capital One, but without more, they do not plausibly raise the inference that a uniform policy—let alone one actionable under § 349—is the cause of such grievances.  Without further factual allegations supporting the existence of a such a policy, the § 349 claim must be dismissed.  *See Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 13 (S.D.N.Y. 2020) ("When allegations are made upon information and belief, the plaintiff must support them by offering facts upon which that belief is founded.").[15]

For similar reasons, Green also fails to set forth a reason why any of Capital One's specific representations about its investigation—all of which simply state that "[Square's] info

---

[15] The court in *Brodie* noted that this is especially true regarding consumer fraud claims such as those under § 349. *Id.*

shows there was no error"—would have been "likely to mislead a reasonable consumer acting reasonably under the circumstances." *See* Docs. 35-4, 35-5; *Oswego*, 85 N.Y.2d at 26.  While Green plausibly alleges that Capital One's conclusion may have been incorrect or the result of an inadequate investigation, is not plausible that Green would be *deceived or misled* by such representations.  Rather, to the extent that Capital One's statements about its investigation contradict Green's view of the evidence, he has taken the position that Capital One is wrong and must have insufficiently investigated the claim.  Because this is what a reasonable person would be expected to conclude when presented with a statement they believe is contradicted by other evidence, Green fails to allege any deceptive or misleading conduct.[16]

## IV.    CONCLUSION

For the reasons discussed, Capital One's motion to dismiss the EFTA claims is DENIED and its motion to dismiss the G.B.L. § 349 claim is GRANTED.  The parties are directed to appear for a telephonic conference on September 15, 2021 at 9am.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 33.

Dated:    August 26, 2021
          New York, New York

_____

EDGARDO RAMOS, U.S.D.J.

---

[16] Green fails to state a GBL § 349 claim for the reasons discussed above.  However, the Court finds that he would have adequately pleaded the third prong—a resulting "injury"—if the first two statutory requirements had been met, as Green has alleged that Capital One reversed the provisional refund it granted him pursuant to its allegedly misleading investigation.